AF Approval _____   Chief Approval _____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                     CASE NO. 6:20-CR-103-ORL-41-LRH

MISUGA KAIUN CO. LTD.

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Maria Chapa Lopez, United States Attorney for the Middle District of

Florida, and the Environmental Crimes Section of the United States

Department of Justice, and the defendant, MISUGA KAIUN CO. LTD.,

represented by George M. Chalos, mutually agree as follows:

**A.    Particularized Terms**

1.    Count Pleading To

The defendant shall enter a plea of guilty to Count One of the

Information.  Count One is a violation of the Act to Prevent Pollution from

Ships ("APPS"), 33 U.S.C. § 1908(a), for failing to maintain an accurate Oil

Record Book ("ORB") during a commercial vessel port call into Port

Canaveral, FL, on or about May 22, 2020.

Defendant's Initials _____

2.    Maximum Penalties

Defendant understands and agrees that the maximum statutory penalties applicable to a corporate defendant for each felony count to which it is entering a plea of guilty is a fine of $500,000 or twice the gross gain or loss caused by the offense, whichever is greater, a term of probation of five (5) years, and a special assessment of $400 per felony count. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.    Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty. For each element of the offense the defendant acted through its agents and employees who were acting within the scope of their employment and agency and for the intended benefit of defendant, at least in part.

The elements of Count One are:

First: The Defendant, in the Middle District of Florida and elsewhere, failed, or caused the failure, to accurately maintain

Defendant's Initials _____ 2

an Oil Record Book for a ship of 400 gross tons and above (that is not an oil tanker);

Second: The Defendant did so while subject to APPS oil discharge regulations (that is while in the navigable waters or at a port or terminal of the United States);

Third: The Defendant did so knowingly.

4.    Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida and the Environmental Crimes Section of the United States Department of Justice agrees not to charge defendant, or the owner of the *M/V DIAMOND QUEEN*, Seavance Shipping S.A., with committing any other federal criminal offenses known to the United States Attorney's Office for the Middle District of Florida and the Environmental Crimes Section at the time of the execution of this agreement, related to the events that resulted in the charges contained in the Information or referenced in the factual basis for this agreement.

6.    Guidelines Sentence -- Joint Recommendation

That the Court will take into account, but is not bound by, the applicable United States Sentencing Guidelines. The Parties agree that the

Defendant's Initials _SM_                    3

imposition of a fine is not governed by the USSG. That is because, although

the offense conduct to which the Defendant is pleading guilty is covered by

USSG §2Q1.3, "Mishandling of Other Environmental Pollutants;

Recordkeeping, Tampering, and Falsification," that Guideline is not listed

under USSG §8C2.1, which governs criminal fines for organizations.

Accordingly, pursuant to USSG §8C2.10, the sentence of a fine is determined

by applying Title 18, United States Code, Sections 3553 and 3572.

       Pursuant to the Fed. R. Crim. P. 11(c)(1)(B), the United States

and the defendant agree to jointly recommend to the Court the sentence

articulated below. The United States and the defendant agree that the

recommended sentence satisfies the purposes of sentencing and the factors set

forth in Title 18, United States Code, Sections 3553, 3571 and 3572. The

parties understand that such a joint recommendation is not binding on the

Court and that, if it is not accepted by this Court, neither the United States nor

the defendant will be allowed to withdraw from the plea agreement, and the

defendant will not be allowed to withdraw from the plea of guilty.  The parties

make the following joint recommendations.

       A. Fine: Defendant agrees to pay a fine of $1,500,000.00. The

parties agree that the fine has been properly calculated pursuant to 18 U.S.C. §

Defendant's Initials _____        4

3571(d) as representing twice the gain to defendant. The fine is due within thirty (30) days of sentencing or as may be ordered by the Court.

B. Probation: The parties jointly recommend that the defendant be placed on organizational probation for a period of 4 years from the date of sentencing pursuant to 18 U.S. C. § 3561 (c)(1) and U.S.S.G. §§ 8D1.1 and 8D1.2. The parties agree that the Defendant may move for early termination of probation. The government will not object to early termination of probation after 36 months absent good cause. The parties recommend that the terms of probation be as follows:

(1) No Further Violations. Defendant agrees that it shall commit no further violations of MARPOL Protocol, federal, state or local law, including those laws and regulations for which primary enforcement has been delegated to the state authorities, and shall conduct all its operations in accordance with the environmental laws of the United States.

(2) Payments. Payment in full of the monetary amounts as set forth herein including all special assessments, fines and restitution (if any).

(3) Environmental Compliance Plan. Defendant agrees to fund and implement the environmental remedial measures set forth in the Environmental Compliance Plan ("ECP"), attached hereto as Attachment A,

Defendant's Initials _____          5

during its term of probation, consistent with sentencing policies set forth in

U.S.S.G. § 8D1.4.

        (4) No Retaliation. Defendant agrees that it will not take

any adverse action against the officers and crew members who cooperated

with the investigation because of their cooperation.

    7.   <u>Cooperation</u>

        As part of this Plea Agreement, the defendant agrees that it will

continue to comply with the terms of the Agreement on Security entered into

on June 5, 2020, with the United States regarding all obligations remaining

thereunder including repatriating any crewmembers remaining in the United

States once the crewmembers' testimony and/or presence in the United States

is no longer required by the United States. This obligation includes continuing

to provide for the crewmembers that remain in the United States until the final

resolution of all criminal charges arising from the conduct on the *M/V*

*Diamond Queen* have been fully litigated. Defendant also agrees not to oppose,

and cause others to oppose, any recommendation for payment to an

individual made by the United States pursuant to 33 U.S.C. § 1908(a).

    8.   <u>Corporate Defendant</u>

        The undersigned corporate officer or representative of the

defendant hereby certifies that he is authorized by the defendant corporation

Defendant's Initials _____      6

to act on its behalf, to plead guilty to the charges alleged in the Information, and to enter into this Plea Agreement, and that a corporate resolution so empowering said officer or representative has been duly made and approved by said corporation. Defendant also agrees that the actions of its agents and/or employees as described in the Factual Basis were within the scope of their agency and/or employment and were intended, at least in part, to benefit defendant, therefore defendant is vicariously liable for their actions.

**B.     Standard Terms and Conditions**

  1. Restitution, Special Assessment and Fine

   The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not

Defendant's Initials _ℓ/ℳ_   7

limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied. On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due within thirty (30) days of sentencing or as may be ordered by the Court. The defendant understands that the special assessment is in addition to any fine imposed by the Court.

    2.    <u>Sentencing Information</u>

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

    3.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement,

Defendant's Initials _____    8

or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

4.     Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground

Defendant's Initials _____          9

that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

5. <u>Middle District of Florida and Environmental Crimes Section Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and the Environmental Crimes Section of the Department of Justice and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

6. <u>Filing of Agreement</u>

This agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

Defendant's Initials _____    10

7.   <u>Voluntariness</u>

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant

pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.

8.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

9.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _____      12

10.   Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ___10th___ day of July, 2020.

MARIA CHAPA LOPEZ
United States Attorney

_____
Misuga Kaiun Co. LTD
Defendant

_____
John M. Gardella
Assistant United States Attorney

_____
George M. Chalos
Attorney for Defendant

_____
Sara C. Sweeney
Assistant United States Attorney
Orlando, Deputy Chief

_____
Kenneth E. Nelson
Senior Trial Attorney
Environmental Crimes Section

Defendant's Initials _____                    13

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 6:20-CR-

MISUGA KAIUN CO. LTD

<u>PERSONALIZATION OF ELEMENTS</u>

Count One:

<u>First</u>:        Did you, in the Middle District of Florida and elsewhere,
                 fail, or cause the failure, to accurately maintain an Oil
                 Record Book for a ship of 400 gross tons and above (that is
                 not an oil tanker)?

<u>Second</u>:     Did you do so while subject to APPS oil discharge
                 regulations (that is while in the navigable waters or at a
                 port or terminal of the United States)?

<u>Third</u>:        Did you do so knowingly?

Defendant's Initials                  14

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                              CASE NO. 6:20-CR-

MISUGA KAIUN CO. LTD

## FACTUAL BASIS

Defendant MISUGA KAIUN CO. LTD. ("MISUGA" or "Defendant") and the United States of America, by and through the United States Attorney for the Middle District of Florida and the Environmental Crimes Section of the United States Department of Justice (collectively referred to herein as "the United States" or "the Government"), hereby agree that this Joint Factual Statement is a true and accurate statement of the Defendant's criminal conduct and that it provides a sufficient basis for the Defendant's plea of guilty to Count One of the Criminal Information.

Defendant's Initials          15

A. *M/V DIAMOND QUEEN*

MISUGA operated the Motor Vessel ("*M/V*") *DIAMOND QUEEN*
from at least February 20, 2013, until at least on or about May 22, 2020. The
*M/V DIAMOND QUEEN* bore the International Maritime Organization
identification number 9642136 and was flagged, or registered, in Panama.

The *M/V DIAMOND QUEEN* was a 656 foot, 34,800 gross ton ocean-
going commercial vessel. The *M/V DIAMOND QUEEN* transported
commercial cargo around the world including in the port of Port Canaveral,
Florida. The vessel had a crew including, at various times, a Master, Chief
Engineer, First Assistant Engineer, Second Assistant Engineer, Third
Assistant Engineer, and Oilers. The crew acted on behalf of MISUGA,
carrying out activities on the vessel to ensure the vessel was able to operate
and carry cargo throughout the world.

All of the actions taken by the Defendant as described in the Criminal
Information were done by agents of MISUGA who were acting within the
scope of their agency and with the intent, at least in part, to benefit
MISUGA.

The Master was overall in charge of the vessel and responsible for
numerous documents, including the Oil Record Book ("ORB"). The Chief
Engineer was in charge of the engineering department, supervising

Defendant's Initials                 16

engineering personnel and responsible for the proper disposal of oily waste generated in the engine room. The Chief Engineer knowingly caused the Master to fail to maintain an accurate Oil Record Book.

On vessels like the *M/V DIAMOND QUEEN*, machinery space bilge water, is generated on a regular basis. Machinery space bilge water refers to oil and water that drips and leaks from machinery and mechanical systems and accumulates in the bilge, which is the bottom-most portion of the engine room. Machinery space bilge water is also known as "oily bilge water" and is defined in 33 C.F.R. § 151.05 as "water which may be contaminated by oil resulting from things such as leakage or maintenance work in machinery spaces. Any liquid entering the bilge system including bilge wells, bilge piping, tank tops or bilge holding tanks is considered oily bilge water."

Machinery space bilge water can be disposed of in only two manners: (1) it may be processed through the onboard Oily Water Separator and Oil Content Monitor resulting in an overboard discharge of water with no more than 15 parts per million ("ppm") of oil, or (2) it may be disposed of to a barge or other shore-based disposal facility. Prior to processing or disposal, machinery space bilge water must be transferred to, and stored in, the vessel's bilge water holding tank.

All disposals and transfers of machinery space bilge water, whether through use of the Oily Water Separator or transfer to a shore-based facility, must be recorded by the person or persons in charge of those operations in the vessel's Oil Record Book.  The Chief Engineer was the person in charge of these operations and required to make accurate entries in the vessel's Oil Record Book.

B. DISCHARGES FROM BILGE HOLDING TANK

From approximately April 2019, until on May 18, 2020, on several occasions, the low-level engineering crewmembers, at the direction of the Chief Engineer onboard the *M/V DIAMOND QUEEN*, discharged the bilge holding tank utilizing the emergency de-watering system in the engine room. This was accomplished by altering a non-return valve and using the general services pump to discharge the bilge holding tank directly into the sea. These discharges were made without the use of the Oily Water Separator and were not recorded in the Oil Record Book as required.

C. THE COAST GUARD INSPECTION

On or about May 20, 2020, the *M/V DIAMOND QUEEN* arrived in Port Canaveral, Florida. On or about May 22, 2020, members of the United States Coast Guard conducted an inspection of the *M/V DIAMOND QUEEN* after receiving information from a crewmember that

Defendant's Initials _____   18

there had been discharges of untreated bilge water from the vessel. During the inspection, the Chief Engineer was interviewed by the inspectors and asked questions about whether machinery space bilge water had been discharged overboard without using the Oily Water Separator. The Chief Engineer admitted that he had directed such discharges, that he was responsible for them, and he then agreed to show the inspectors in the engine room how the discharges were done.  When the vessel arrived in United States waters, the Oil Record Book did not accurately record the discharges.

**ATTACHMENT A**
**Environmental Compliance Plan**

PURSUANT TO PLEA AGREEMENT

**United States v. MISUGA KAIUN CO. LTD**

The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PLAN (ECP) have been prepared pursuant to the Plea Agreement between MISUGA KAIUN CO. LTD. (hereinafter "MISUGA") and the United States (hereinafter "Government") filed in the United States District Court for the Middle District of Florida. Compliance with all of the standards and requirements of the ECP is an essential term of the Plea Agreement.

The ECP includes various provisions to ensure that all vessels operated, and/or technically managed by MISUGA, which call at U.S. ports, are manned pursuant to an agreement with Manila Ocean Crew Management Inc., and are subject to this ECP (hereinafter the "Covered Vessels"), comply with all applicable maritime environmental requirements established under applicable international, flag state and port state law, including, but not limited to the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL), and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA), and the Oil Pollution Act of 1990 (OPA 90), and with the requirements of this agreement itself. The auditing requirements of this ECP apply to the Covered Vessels. As more fully set forth below, this ECP and its requirements will also apply to vessels that MISUGA acquires or assumes management of during the period of probation and will call at U.S. ports during the term of probation that are manned pursuant to an agreement with Manila Ocean Crew Management Inc.

The Covered Vessels as of the date of signing of this ECP are:

| Vessel Name | IMO# |
|---|---|
| GLOBAL AQUARIUS | 9550436 |
| SHIMANAMI QUEEN | 9589786 |
| BLUE DRAGON | 9604794 |

1

| | |
|---|---|
| FUGA | 9624615 |
| DIAMOND QUEEN | 9642136 |
| MALTO HOPE | 9660035 |
| GARDENIA K | 9675559 |
| INLAND SEA | 9675731 |
| BULK CARINA | 9780976 |
| MALTO ELAN | 9792436 |
| ENISHI | 9772802 |
| ICY BAY | 9722467 |
| BERGE JUNGFRAU | 9846304 |
| FEDERAL INNOKO | 9866615 |

## A.   APPLICABILITY/PURPOSE

(1)   This ECP shall cover and apply to all of MISUGA's operations involving the Covered Vessels.

(2)   This ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of MISUGA operated and/or managed vessels, shore side facilities, and operations involving said vessels; increase training of all MISUGA personnel involved with said vessels; develop and implement management and engineering controls to better manage, detect and prevent environmental violations; and require periodic reports to the United States Probation Office for the Middle District of Florida, the United States Attorney's Office for the Middle District of Florida, the Environmental Crimes Section of the United States Department of Justice, and the United States Coast Guard (collectively hereinafter "the United States") to ensure that MISUGA is following the requirements of this ECP and that all of its Covered Vessels comply with all applicable maritime environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations, and that an effective environmental management system is in place to prevent recurrence of violations.

**B.    COMPLIANCE MANAGER**

(1)    Within sixty (60) days of entry of the Plea Agreement, MISUGA shall designate a Compliance Manager (hereinafter "CM") who shall report directly to the Managing Director ("MD") of MISUGA. MISUGA shall provide the name of the CM to the United States. The CM could be the same individual as MISUGA's "designated person" under the ISM Code unless reasons are provided to the United States justifying why the "designated person" should not also be the CM. The CM shall be responsible for coordinating with the Third Party Auditor (hereinafter "TPA"), as more fully described below, developing and implementing all of the procedures and systems required herein, establishing and implementing training programs for the officers and crew of MISUGA operated and/or managed vessels, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the Court Appointed Monitor (hereinafter "CAM") and the United States. All reports required under this ECP shall be reviewed by the CM and signed under the penalty of perjury.

(2)    MISUGA shall establish a procedure and reporting system that requires and enables all officers, crewmembers and employees, and shore side personnel involved in the operation of MISUGA's Covered Vessels, including all persons working for MISUGA, its subsidiaries, affiliated business entities (owned wholly or partially by MISUGA) and agents of MISUGA as either direct employees or independent contractors, to notify the CM of all violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the CAM and the United States in carrying out the reviewing, auditing and oversight functions required by applicable law and this ECP. MISUGA agrees to establish a procedure that makes failure to notify the CM of any violations of any applicable environmental requirements and failure to cooperate fully with the Classification Societies, the CAM and the United States in carrying out their auditing and oversight functions required by applicable law and this ECP, grounds for dismissal. MISUGA agrees not to retaliate against any officer, crewmember, employee, or shore side personnel involved in the operation of MISUGA seagoing vessels, including all persons working for MISUGA, its subsidiaries, affiliated business entities (owned wholly or partially by MISUGA) and agents of MISUGA as either direct employees or independent contractors or any entity making any such report.

(3)    The CM shall be authorized to access all records and personnel regarding all vessels subject to the ECP for the purpose of ensuring compliance with the ECP. The CM shall be authorized to implement all requirements of the ECP on all vessels subject to the ECP. The CM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that

reports are made on a timely basis to the U.S. Probation Office, CAM, the designated representative of the Coast Guard, and MISUGA. The CM position will be filled by an individual(s) with significant maritime vessel operational background, who possesses auditing experience and is thoroughly familiar with the requirements of this ECP, and is knowledgeable about domestic and international maritime environmental laws and regulations.

### CM Responsibilities:

(a) <u>Development and Maintenance of Effective Training Programs</u>. The CM will be responsible for developing training programs to educate and train MISUGA employees on their environmental commitment, the requirements of the ECP, the policies and procedures for complying with the ECP, and the possible consequences to MISUGA and to individuals for failure to comply with environmental laws. The CM shall also provide environmental consultants and contractors of MISUGA involved in the operation of covered vessels with documents and training to make them aware of this ECP and its requirements.

(b) <u>Auditing and Compliance Assessment</u>. Verify that the TPA conducts the review and audits required by the ECP and that the required reports are prepared.

(c) <u>Fleet Reviews</u>. Supervise annual overall reviews of the environmental compliance program and "focused" reviews of key environmental areas to promote the adoption of "best practices".

(d) <u>Reporting of Non-Compliance by Employees and Crew Members</u>. Establish a means by which employees may report (anonymously if the employee so desires) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection. The CM shall review, investigate, and document in a timely fashion reports of non-compliance received from employees and shall initiate, monitor, and document all actions taken as a result of such reports. The CM shall maintain records of such reports and action taken, and shall make them available for review by the TPA and the CAM.

## C.   MASTER AND CHIEF ENGINEER

(1)   The Master of each Covered Vessel shall ensure that prompt reports are made to the CM of any non-compliant condition associated with

environmental protection of any Covered Vessel.

(2)    The Chief Engineer on board all Covered Vessels shall perform the following duties regarding this ECP:

> (a)    Daily measure, monitor, record and manage shipboard generated wastes generated by engineering operations;
>
> (b)    Report to the CM and cooperate with MISUGA to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment and document all efforts to do so in a log that is available for review and audit.

## D.    THIRD PARTY AUDITOR

(1)    During the probationary period, a TPA shall conduct the audits and submit the reports described in this ECP.  Within sixty (60) days of sentencing, MISUGA shall submit to the Government a list of three (3) qualified candidates for the TPA position along with its recommendation for approval of one of the candidates, from which the Government will select a candidate to serve as the TPA. To the extent practicable, MISUGA will endeavor to submit candidates that have not provided auditing services to MISUGA within the last calendar year prior to the U.S. Coast Guard boarding of the *M/V DIAMOND QUEEN* that initiated the investigation which ultimately led to the plea agreement in this case, or is not associated with the Classification Societies or Flag Administrations to which the Covered Vessels are classed or registered. In the event that none of the candidates is found acceptable, or if the work of the TPA is unsatisfactory at any time, the Government may request that MISUGA supply additional candidates. The Government reserves the right to reject any proposed TPA. All work performed by the TPA and its auditors must be certified as being accurate and truthful. The certification shall be made with the understanding that any false information knowingly submitted is subject to prosecution under 18 U.S.C. §1001.

(2)    Qualifications. Qualified candidates for the TPA include individuals or firms that have staff capable of applying the most current International Standards Organization ("ISO") 14000 environmental management auditing criteria and have the following experience, expertise, and capabilities:

> (a) expertise and competence in the regulatory programs under United States and other Marine Environmental Protection Requirements; '
>
> (b) experience in performing environmental audits in industrial or maritime environments, and;

(c) sufficient expertise and competence to assess whether MISUGA has adequate policies, procedures, and equipment in place to ensure compliance with this ECP and to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance.

(3)     Adequacy of Staff. The TPA must have adequate staff to perform the work required of this ECP.  Due to the in-depth nature of the audit criteria, persons with specialized knowledge and experience will be required to perform the audits.  The knowledge, skills and abilities of the TPA and staff must align with the criteria of the audits.  Experienced personnel with extensive operational, maintenance and repair of shipboard and machinery space systems, equipment, and components is a prerequisite. The TPA shall employ at least one senior level Marine Engineer (Chief, First or Second Engineer) to perform shipboard machinery space audits, or they must have an equivalent level of vessel inspection experience. The TPA shall provide the Government with the resumes of the TPA's auditors assigned to conduct shore-side and vessel audits.

(4)     Contractual Independence. During the term of probation, the TPA shall not directly own any stock in MISUGA; must have no other ongoing contractual or business relationship, other than that of the TPA, with MISUGA; and may not seek or serve in other capacities with MISUGA, unless first disclosed to the Government, the Court, and the CAM, and unless expressly approved by the Government.  The TPA must exercise independent judgment and ensure that the objectives set forth in this ECP are met.  MISUGA and the TPA shall notify the Government if any contractual relationships or proposed contractual relationships between MISUGA and the TPA arise during the term of probation.

(5)     Functional Independence. The TPA shall function independently of MISUGA, but may communicate with MISUGA about the substance of its work. At its discretion, the TPA may share with MISUGA its audit checklist.  The TPA may consult with, but shall not receive or request approval of any form from any employee of MISUGA regarding the development, clearance, or evaluation of any document, report, or communication of any kind, whether draft or final, required by this ECP.

## E.     ENVIRONMENTAL MANAGEMENT SYSTEM

(1)     The CM shall be responsible for establishing an Environmental Management System (EMS).  To the extent possible, the EMS shall be based upon the ISO 14001/2015 standards and shall be part of MISUGA documented management system.

(2)     Environmental Policy:

a. The EMS should be based upon a documented and clearly communicated policy. This policy should set out the MISUGA commitment towards a clean marine environment. It should include:

    i.   provision for compliance with environmental requirements;

    ii.  commitment to continuous improvement in environmental performance, including those areas required by this ECP;

    iii. commitment to pollution prevention that emphasizes source reduction, to include funding and human resources necessary to effectively maintain and repair the systems, equipment and components found in machinery and cargo (deck) spaces of vessels;

    iv.  commitment to continuous reduction of environmental risks;

    v.   commitment to sharing information with external stakeholders on environmental performance.

(3)    Communication of Environmental Requirements:

The EMS must provide a means to identify, explain, and communicate all environmental requirements, and any additional best practices or industry norms which MISUGA may choose to adopt, to MISUGA employees, and other vendors, technicians or non-crewmembers who are boarding and/or sailing with the Covered Vessels and are engaged in the waste stream management of the Covered Vessels. The EMS must also specify procedures for incorporating changes in operations or environmental requirements into the communication plan.

(4) Objectives and Targets:

(a)    The EMS shall establish specific objectives and targets for:

(i)    achieving and maintaining compliance with all applicable marine environmental protection requirements and the requirements of this ECP;

(ii)   environmental performance demonstrating continuous improvement in regulated and non-regulated areas;

(iii)  pollution prevention that emphasizes source reduction with respect to machinery space waste streams and effective management of cargo related wastes; and

(iv)  sharing information with external stakeholders on environmental performance against all EMS objectives and targets, upon request.

(b)     The EMS shall establish appropriate time frames to meet these objectives and targets. These must be documented and updated as environmental requirements change or as modifications occur in activities and structures within organizations in a manner that affects environmental performance or as a result of recommendations made by the TPA.

(5)     Structure, Responsibility and Resources:

MISUGA will ensure that it is equipped with sufficient personnel and other resources to meet its objectives and targets. The EMS will describe in detail the procedures and steps for achieving those objectives and targets. The EMS will define the compliance roles and responsibilities of all Covered Vessels and shore side personnel involved with the operation, maintenance and repair of MISUGA vessels, and will indicate how they and other corporate personnel will be held accountable for achieving and maintaining compliance with this EMS and other applicable marine environmental protection requirements. The EMS will also establish procedures for receiving and addressing concerns raised by MISUGA employees and others regarding environmental performance and compliance.

(6)     Operational Control:

The EMS will identify and provide for the planning and management of all of MISUGA operations and activities with a view to achieving the ECP objectives and targets. For example, vessel deck department and engine room machinery space maintenance and repair will be an important aspect in achieving and maintaining compliance and enhancing environmental performance.

(7)     Corrective and Preventive Action and Emergency Procedures:

(a)     MISUGA, through its EMS, will establish and maintain documented procedures for preventing, detecting, investigating, promptly initiating corrective action, and reporting (both internally and externally) any occurrence that may affect the organization's ability to achieve the ECP objectives and targets.

(b)     Such measures must address incidents that may have an effect on compliance with environmental requirements as well as on environmental performance in regulated and non-regulated areas,

including requirements of this ECP, or other applicable marine environmental protection requirements. Examples of such situations include incinerator or oily water separator malfunctions, overflows of fuel or slop tanks, overflow of tanks within machinery spaces, fuel oil, lube oil, saltwater line failures, operator errors and other accidental releases, as well as ODME malfunctions.

(c)   The EMS must also establish documented procedures for mitigating any adverse impacts on the environment that may be associated with accidents or emergency situations. If the environmental violation or incident resulted from a weakness in the system, the EMS should be updated and refined to minimize the likelihood of such problems recurring in the future. The EMS should also, to the extent possible, provide for the testing and evaluation of emergency procedures.

(8)   Training, Awareness and Competence:

The EMS must establish procedures to ensure that all personnel (including vendors, technicians, and other non-crewmembers) who are boarding and/or sailing with the vessels and whose job responsibilities affect the ability to achieve the ECP objectives and targets, have been trained and are capable of carrying out these responsibilities. In particular, the training should highlight means to enhance the ability of such personnel to ensure compliance with environmental requirements and voluntary undertakings, the requirements of the ECP, and other marine environmental protection requirements.

(9)   Organizational Decision-making and Planning:

The EMS must describe how these elements will be integrated into the MISUGA overall decision-making and planning, in particular, decisions on capital improvements, training programs, and vessel operations, maintenance, and repair activities.

(10)   Document Control:

The EMS must establish procedures to ensure maintenance of appropriate documentation relating to objectives and targets and should also ensure that those records will be adequate for subsequent evaluation and improvement of the operation of the EMS. Additionally, all records will be maintained and made available to the TPA and port and

flag state personnel upon request.

(11)    Continuous Evaluation and Improvement:

(a)    The EMS must include methods to perform periodic, documented and objective internal auditing of the organization's performance in achieving these objectives and targets, and on how well the ECP assists the organization in achieving those objectives and targets. This requirement is independent from the auditing requirements detailed elsewhere in this plan. The goal of these internal audits and reviews will be to allow management to continuously monitor and assess vessel systems, equipment and components, and the ability and proficiency at which vessel crew members and personnel ashore comply with the policies and procedures established by this ECP.

(b)    The EMS will identify an ongoing process for assessing when a vessel is to be taken out of service for an environmental discharge related repair.

(c)    The EMS will include organization charts, as appropriate, that identify shore side and vessel individuals having environmental performance, risk reduction, and regulatory compliance responsibilities. The charts shall also specify responsibilities of Marine and Technical Superintendents to report information related to environmental releases or inadequate performance of environmental pollution protection equipment, casualties causing internal spills, excessive waste development and leaking equipment with oil-to-sea interfaces.

(d)    The EMS will promote non-retaliatory practices and ensure that employees are not punished or otherwise suffer negative consequences for reporting suspicious behavior and/or suspected violations of environmental laws, regulations, or policies.

(e)    The EMS will describe potential consequences for departure from specified operating policies and procedures, including possible termination of employment, as well as criminal/civil/administrative penalties as a result of noncompliance.

(f) The EMS will make employee compliance with environmental policies of the ECP, and other applicable marine environmental protection requirements a positive factor, and failure to comply a negative factor, in all evaluations undertaken for the performance of all MISUGA employees.

(g)     The EMS will include policies against any incentive or bonus programs based on minimizing operational costs associated with the operation, maintenance and repair of machinery space or cargo/deck space systems, equipment and components to ensure that employees do not avoid such costs and thereby sacrifice environmental compliance.

(h)     The EMS will describe a confidential reporting system that is adopted to ensure that employees may quickly and confidentially report discharges, spills, environmental incidents and other environmental performance data.

(i)     The EMS will identify all operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on vessel engine room operations, systems, equipment and components and cargo residue management.

(j)     The EMS will identify the types of records developed and maintained in support of the ECP such as reports, audit working papers, correspondence, communications, reports from the confidential system for non-compliance reporting, and identify personnel responsible for their maintenance, and procedures for responding to inquiries and requests for release of information. The EMS shall provide a system for conducting and documenting routine, objective self-inspections by MISUGA internal auditors, supervisors, and trained staff to check for malfunctions, deterioration, and inadequate maintenance of pollution prevention equipment, worker adherence to SOPs, unusual situations, and unauthorized releases.

## F.     COURT APPOINTED MONITOR

As part of the ECP, MISUGA agrees to pay for a Court Appointed Monitor (hereinafter "CAM") that will report to the Court and the United States during the entire period of probation. Within sixty (60) days of sentencing, MISUGA will submit a list of three qualified candidates for the CAM from which the United States will select one of the candidates. In the event that the United States does not find one of the candidates satisfactory, it may request MISUGA to supply additional candidates. Further, if an agreement cannot be reached regarding the selection, the decision shall be left up to the Court.

(1)     Qualified candidates for the CAM position must have expertise and competence in the regulatory programs under U.S. and international

11

environmental laws, and have expertise and competence in waste stream evaluation, monitoring and control technologies, with a primary emphasis on engine room and machinery space operations, used by MISUGA to achieve and maintain compliance in respect to MISUGA seagoing vessels subject to this ECP. The CAM shall also have sufficient expertise and competence to assess whether MISUGA has an adequate Environmental Management System in place to assess regulatory and ECP compliance, to correct non-compliance, and to prevent future non-compliance.

(2)     The CAM must not directly own any stock in MISUGA, any of its subsidiaries, affiliated business entities (owned wholly or partially by MISUGA) or any agents of MISUGA, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The CAM must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If MISUGA has any other contractual relationship with the CAM, both MISUGA and the CAM shall disclose to the United States such past or existing contractual relationships.

(3)     If the United States determines that the proposed CAM does not reasonably meet the qualifications set forth in the previous paragraphs, or that past or existing relationships with the CAM would affect the CAM's ability to exercise the independent judgment and discipline required to conduct the ECP review and evaluation, such CAM shall be disapproved and another CAM shall be proposed by MISUGA within thirty (30) days of MISUGA's receipt of the United States' disapproval.

## G.    THE AUDITS

(1)     During the first two (2) years of probation, the TPA shall audit MISUGA's operations (vessel and shore side) including all of the Covered Vessels while the vessels are underway, to the maximum extent practicable. These audits should take place on voyages of short duration (2-3 days) to the maximum extent practicable. MISUGA and the TPA shall coordinate the audits to accommodate, as much as practicable, the vessels' operations and schedule. The audits shall be performed to ascertain and evaluate various aspects of MISUGA vessels: their systems, equipment and components; current practices whether documented or not; and the knowledge, skills, and abilities of ship and shore side personnel as they relate to the requirements of this ECP, and other applicable maritime environmental protection requirements. During the third year of probation, final audits shall be

carried out as per paragraph I "FINAL EMS/ECP COMPLIANCE AUDIT" below.

(2)     The audits performed pursuant to this ECP shall exceed a typical SMS audit in scope and will be used to determine practices, procedures and equipment conditions not typically documented during a routine inspection by the classification society, port or flag state. The results of the audits will be used to shape and revise the Environmental Management System established by this ECP.

(3)     The audits shall meet the following specific requirements:

a.     It shall assess all waste streams developed from any system, equipment and components found in each machinery space on board MISUGA vessels. This will include observation and documentation describing the status and quantity of leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:

  i. all pump and valve seals and glands during operation,
  ii. all piping systems, flanges, gaskets, fittings and joints,
  iii. all equipment casings such as main and auxiliary engines, and reduction gears,
  iv. operation of engines, boilers, incinerators, and evaporators,
  v. all cargo tank stripping lines and ODME systems, and
  vi. all other mechanical components found aboard MISUGA vessels.

b.     It shall assess the adequacy and performance of the Oily Water Separator (OWS) and Incinerator, Sewage System, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations. To assess the performance of the OWS, the TPA shall conduct an operational test using the normal tank or bilge well supply as would be used in normal operations. The supply tank or bilge well must not be diluted. It will include an evaluation of the capacities for all tanks or containers associated with the management of sludge, bilges and oily wastes or other wastes. It will include an evaluation of documentation tracking, maintenance and repair, and modifications of all pollution prevention equipment, and notification of equipment failure to the CM, CAM, and other shore side personnel.

c.     Assess each vessel's crew ability to handle the operational,

maintenance, and repair workloads in maintaining all systems, equipment, and components onboard in order to minimize waste stream development to as low as reasonably practical.

d.     It shall assess the adequacy of the policy, procedures, current practices and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel and the effectiveness of garbage management plans.

e.     It shall assess the adequacy of the policy, procedures, current practices and equipment associated with cargo management developed during all evolutions of cargo operations.

f.     It shall assess the adequacy of each vessel's responsible crewmembers to maintain the following records and shall include a complete comparative analysis (against each other where possible) of the following records:

(i)     Oil Record Book,
(ii)    Engine Room Alarms,
(iii)   Tank sounding logs (if vessel does not maintain such a log, it must start),
(iv)    Personal work records and lists related to pollution prevention equipment,
(v)     Maintenance records related to pollution prevention equipment,
(vi)    Vendor service records related to pollution prevention equipment,
(vii)   Bilge waste and sludge receipts,
(viii)  Deck Log,
(ix)    Garbage Record Book,
(x)     Oil to Sea Equipment Interface Logs,
(xi)    Hazardous waste manifests,
(xii)   Solid waste discharge receipts,
(xiii)  Content Monitor (OWS) calibration logs or annual  surveys by the makers,
(xiv)   Training records related to pollution prevention,
(xv)    Inspection Documents, and
(xvi)   SMS or SQE Audit documents.

g.     It shall assess the adequacy of the policy, procedures, and current practices used to store and  dispose of:

(i)      Solvents,
(ii)     Degreasers,
(iii)    Cleaning wastes,
(iv)     Batteries,
(v)      Paints,
(vi)     Oily rags,
(vii)    Fluorescent and incandescent bulbs,
(viii)   Expired boiler and engine chemicals,
(ix)     Used boiler and engine chemicals,
(x)      Galley greases,
(xi)     Pyrotechnics,
(xii)    Medical supplies,
(xiii)   Contaminate fuels,
(xiv)    Used Oil and greases,
(xv)     Incinerator ash,
(xvi)    Transformer oils, and
(xvii)   Contaminated refrigerants.

h.    It shall assess and evaluate documentation containing the certifications that each Covered Vessel's officers understand the requirements of this ECP and shall require signed statements by all vessel officers attesting that they understand false entries in the Oil Record Book for machinery space and deck/cargo space operations is a violation of law.

i.    It shall assess the policy, procedures, and current practices associated with the Master and Chief Engineer's capability to communicate with shore side personnel, including the CM and designated persons, and shall review such communications.

j.    It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

k.    It shall assess the policy, procedures, and current practices used on Covered Vessels and ashore to track crewmember environmental training, as well as the availability of and access to training resources.

l.    It shall assess the adequacy of existing methods for employees to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crewmembers and shore side personnel.

15